# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2263

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern District |
| | * | of Missouri. |
| Juan Francisco Gonzalez, | * | |
| also known as Michael | * | |
| Andrew Quinones, | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted: November 18, 2003
Filed: April 26, 2004

_____

Before RILEY, RICHARD S. ARNOLD, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Juan Francisco Gonzalez appeals his conviction and sentence on charges of conspiracy to distribute and possess with the intent to distribute more than five kilograms of cocaine and more than 100 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and 846, and a forfeiture judgment in the amount of $2,000,000

pursuant to 21 U.S.C. §§ 853. We affirm his conviction and the sentence imposed by the district court.[1]

A.    Spanish Language Translations

At trial, the government introduced recordings of court-authorized wiretaps linking Gonzalez to a large-scale drug conspiracy. Several of these wiretaps were in Spanish. During the government's case-in-chief, the district court allowed the jury to read the government's English transcripts of the Spanish conversations as the recordings of those conversations were played. On appeal, Gonzalez argues that the government's transcripts were inaccurate and that he should have been afforded an opportunity to present his translations of the recorded conversations contemporaneously with the government's translations. He also contends that the jury instruction regarding the transcripts was inadequate. We review for an abuse of discretion. See United States v. Beckman, 222 F.3d 512, 520 (8th Cir. 2000) (jury instructions); United States v. Martinez, 951 F.2d 887, 888 (8th Cir. 1991) (admission of tape and transcript).

The translations presented by the government were prepared by several individuals under the supervision of Mr. Chavez. Mr. Chavez, a former police officer, worked on more than ten Spanish-to-English wiretap translations for the Drug Enforcement Agency from 1998 to 2003. He testified that he reviewed all of the translations in this case and found them to be as accurate as possible.

Gonzalez objected to the government's translations and sought to exclude them. The district court overruled Gonzalez's objection and, instead, appointed an experienced translator, Mr. Marquez, to assist Gonzalez in challenging the translations. Mr. Marquez testified that the government's transcripts were accurate

---

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

overall. However, he challenged the following translations: "tontas" as "tons," "mosca" as "money," and "Las Torres" as "New York City." Mr. Marquez testified that those words literally mean "dummies," "fly," and "the towers," respectively. Mr. Marquez was asked whether his literal interpretation of the word "tontas" made any sense when used in the context of the following wiretap translation: "He has five dummies ("tontas"), he is letting me have them for two out here, check it out, huh." Similarly, he was asked whether his interpretation of "mosca" made sense in the following translation: "I mean, what I want is to go and give them some fly ("mosca"), but I want to bring one, one of them here." Mr. Marquez maintained that his translations were accurate.

Initially, we address the appropriate method for introducing transcripts of wiretapped conversations in criminal trials. Like our sister circuits, we believe that whenever the parties intend to introduce a transcript at trial, they should first try "'to produce an 'official' or 'stipulated' transcript, one which satisfies all sides.'" United States v. Cruz, 765 F.2d 1020, 1023 (11th Cir. 1985) (quoting United States v. Wilson, 578 F.2d 67, 69-70 (5th Cir. 1978)). If they are unable to do so, "'then each side should produce its own version of a transcript or its own version of the disputed portions. In addition, each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version.'" Id. (quoting Wilson, 578 F.2d at 69-70).

Gonzalez argues that the district court committed reversible error by making him wait until his case-in-chief to present his expert testimony and translation of the wire interceptions. We disagree. So long as Gonzalez was given the opportunity to challenge the government's translations, the timing of that challenge is left to the discretion of the district court.

We next consider whether the district court erred by allowing the government to introduce transcripts containing the translator's undisclosed opinions regarding

foreign drug code. More specifically, we consider whether it was appropriate to introduce a transcript suggesting that the Spanish words "mosca" and "tontas" mean "money" and "tons," when in fact, they literally mean "fly" and "dummies," respectively.

Generally, transcripts of translated conversations need not be verbatim. See United States v. Garcia, 20 F.3d 670, 673 (6th Cir. 1994); United States v. Zambrana, 864 F.2d 494, 498 (7th Cir. 1988). In the case of slang terms or idioms which are widely used and understood by the native speakers of the foreign language, translators are allowed to provide nonliteral translations so that the foreign term or phrase makes sense in English. Zambrana, 864 F.2d at 498. However, in the case at bar we are not dealing with the translation of common slang terms or idioms. The government's theory at trial was not that "mosca" ("fly") and "tontas" ("dummies") are generally used by Spanish speakers to mean "money" and "tons." Rather, the government's theory was that Gonzalez and his cohorts used those meanings to facilitate communication in their covert drug operations. The problem is that the government's transcript suggested that these words literally mean something they do not.

Although it is unnecessary for a translator to take the intermediate step of providing a literal translation of common slang terms or idioms, we believe more precision is required when dealing with alleged drug code in criminal trials. The potential for prejudice is too great in the latter situation. See United States v. Rena, 981 F.2d 765, 769 (5th Cir. 1993) (holding that the district court abused its discretion in allowing the government to admit transcripts containing the transcribers' interpretations of drug code). Thus, in the case of foreign drug code, the party wishing to introduce the translation should ask the translator to identify the English word that most closely captures the ordinary meaning of the foreign word. Then, the

translator, if qualified as a drug code expert,[2] or another witness with the requisite knowledge, should be asked about his opinion regarding the contextual meaning of the word. For example, if the witness's experience leads him to believe that the declarant used the word "mosca," which literally means "fly," as drug code for "money," then he can so testify. Like all expert testimony, this opinion will be subject to attack on cross-examination and by the introduction of opposing opinions from other qualified experts. Adherence to this procedure will allow the jury to properly weigh the translated evidence.

The district court did not follow the above-mentioned procedure in the case at bar. However, Gonzalez brought the translation discrepancies to the jury's attention through cross-examination of the government's expert and the testimony of his court-appointed translator. Gonzalez's attorney also argued this point in closing argument. Because the jury ultimately received all of the information it needed to weigh the strength of the wiretap transcripts, we find that the district court's error was harmless.

Gonzalez also challenges the district court's jury instruction regarding the transcripts. The district court instructed the jury as follows:

> As you have heard, there is a typewritten transcript of the tape recording you are about to hear. That transcript will be presented to you [] in plasma screen format. That transcript undertakes to identify the speakers engaged in the conversation. You are permitted to view the transcript for the limited purpose of helping you follow the conversation as you listen to the tape recording and also to help you keep track of the speakers. The transcript, however, is not evidence. The tape recording is the primary evidence of its contents.

---

[2]Unlike commonly used slang terms and idioms, drug code is presumably known and understood by only a small segment of the population. Thus, it is not appropriate to presume, without laying a foundation, that a translator is qualified to give opinions relating to alleged drug code.

You are specifically instructed that whether the transcript correctly or incorrectly reflects [the] conversation or the identity of the speakers is entirely for you to decide based upon what you have heard here about the preparation of the transcript in relation to what you hear on the recording. If you decide that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

Differences in meaning between what you hear on the recording or read in the transcript may be caused by such things as the inflection in a speaker's voice. You should therefore rely on what you hear rather than what you read when there is a difference.

The district court's instruction parallels the Eighth Circuit Manual of Model Criminal Jury Instructions, § 2.06 (2003), the only model instruction in this circuit pertaining to transcripts of tape-recorded conversations. This instruction is premised on an assumption that the jury can understand the language being spoken on the recording. Thus, while adequate for transcripts of English conversations, the instruction is not useful for transcripts of conversations originally spoken in a foreign language.

An example of an instruction that solves this problem is the Seventh Circuit's model instruction § 3.18, which provides:

Among the exhibits admitted during the trial were recordings that contained conversations in the _____ language. You were also provided with English transcripts of those conversations. The transcripts were provided to you [by the government] so that you could consider the content of the conversations on the recordings.

Whether a transcript is an accurate translation, in whole or in part, is for you to decide. In considering whether a transcript accurately describes the meaning of a conversation, you should consider the testimony presented to you regarding how, and by whom, the transcript was made. You may consider the knowledge, training, and experience of the translator, as well as the nature of the conversation and the

-6-

reasonableness of the translation in light of all the evidence in the case. You should not rely in any way on any knowledge you may have of the language spoken on the recording; your consideration of the transcripts should be based on the evidence introduced in the trial.

Seventh Circuit Federal Criminal Jury Instructions § 3.18, Foreign Language Recordings/Transcripts in English (1999). This instruction is a coherent, accurate statement of the law. We therefore encourage district courts to use an instruction similar to it when introducing an English transcript of dialogue that originally was spoken in another language.

The crux of the appropriate instruction set forth above is to inform the jury that it must determine the validity of the transcript presented. We believe the jury was aware of this duty in the case at bar. Gonzalez's attorney cross-examined the government's translation expert, called his own translator to rebut the government's transcripts, and challenged the accuracy of the government's transcripts in summation. Thus, although the district court's instruction was not well suited for the facts of this case, Gonzalez did not suffer prejudice.

B.    Other Issues

We now turn to Gonzalez's remaining arguments. Gonzalez claims that a search of the residence at 4925 Shaw Avenue, St. Louis violated his Fourth Amendment rights, because the affidavit in support of the search warrant contained misrepresentations in violation of Franks v. Delaware, 438 U.S. 154 (1978). "To prevail on a Franks claim the defendant[] must show:  (1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining content is insufficient to establish probable cause." United States v. Reinholz, 245 F.3d 765, 774 (8th Cir. 2001).

At trial, co-defendants Jason Webb, Shirley DeClue, Daniel Power, and Mark Riebeling all identified Gonzalez as the leader of the drug organization. Nevertheless, Gonzalez now contends that the search warrant affidavit erroneously characterized him as the head of a narcotics organization. We find that Gonzalez's bald assertion, which was rebutted by trial testimony, is not enough to satisfy the first element of the <u>Franks</u> test.

Gonzalez also argues that the search warrant affidavit contained erroneous translations of wiretapped conversations. Gonzalez's challenge to the translations used in the affidavit is very similar to the challenge he raised regarding the transcripts presented at trial. He claims that the nonliteral translations included in the search warrant affidavit misled the issuing judge.[3] We need not determine today whether the nonliteral translations contained in the search warrant affidavit constituted "false statements" under <u>Franks</u>, because even if the affidavit was perfected as Gonzalez suggests, there would have been probable cause to search the residence. First, when read in context, the issuing judge would have had a reasonable basis for finding that the intercepted conversations were in drug code, in part because the literal translations of the conversations did not make sense. Second, the wiretapped conversations were corroborated by surveillance. Third, in addition to the wiretapped conversations and surveillance, the search warrant affidavit noted that an individual connected with Gonzalez's drug organization had informed law enforcement agents that narcotics were hidden in the residence. Combined, these facts created "a fair probability that contraband or evidence of a crime" would be found therein. <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). Consequently, Gonzalez's <u>Franks</u> claim fails.

---

[3]As noted above, the government translated "tontas" as "tons," "mosca" as "money," and "Las Torres" as "New York City," when those words literally mean "dummies," "fly," and "the towers," respectively.

Gonzalez also argues that the evidence presented at trial was insufficient to support his convictions. We will uphold the verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). In making this determination, we examine the evidence in the light most favorable to the verdict, giving it the benefit of all reasonable inferences. United States v. Cruz, 285 F.3d 692, 697 (8th Cir. 2002).

At trial, co-defendants testified that they had an agreement with Gonzalez to distribute and possess with the intent to distribute cocaine and marijuana. This evidence sufficiently established that Gonzalez was involved in a drug trafficking conspiracy. See United States v. Jimenez-Perez, 238 F.3d 970, 973 (8th Cir. 2001) ("To convict an individual of conspiracy, the government must prove 'that there was a conspiracy with an illegal purpose, that the defendant was aware of that conspiracy, and that he or she knowingly became a part of it.'") (quoting United States v. Beckman, 222 F.3d 512, 522 (8th Cir. 2000)). Gonzalez claims that the co-defendants' testimony was insufficient due to the co-defendants' history of substance abuse and their desire to receive reduced sentences. However, the record reveals that the co-defendants' testimony was corroborated by officer surveillance and seized evidence. In any event, Gonzalez's challenge is unavailing, as issues of witness credibility are for a jury to decide. See United States v. Santos-Garcia, 313 F.3d 1073, 1081 (8th Cir. 2002).

Gonzalez also appeals the district court's imposition of a two-level enhancement for possession of a firearm under U.S.S.G. § 2D1.1(b)(1). At the sentencing hearing, co-defendant DeClue testified that she saw Gonzalez in possession of a gun on approximately four occasions, and that Gonzalez used the gun for protection and to control his drug clientele. According to DeClue, Gonzalez also asked her to deliver a gun to two other members of the conspiracy. Based upon this

evidence, we cannot say that the imposition of a firearm enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) was clearly erroneous. United States v. Williams, 10 F.3d 590, 595 (8th Cir. 1993).

Finally, Gonzalez argues that the district court erred in calculating the drug quantity for which he is responsible. Drug quantities must be proven by a preponderance of the evidence, and we will not reverse absent clear error. United States v. Jimenez-Villasenor, 270 F.3d 554, 561 (8th Cir. 2001).

At trial, co-defendant Webb testified that Gonzalez received a 100-kilogram shipment of cocaine in October 2001. Co-defendants Power and Riebeling testified that Gonzalez directed them to retrieve an additional sixty-kilogram shipment of cocaine. This evidence is sufficient to support the district court's finding that Gonzalez was responsible for more than 150 kilograms of cocaine. See United States v. Sarabia-Martinez, 276 F.3d 447, 450 (8th Cir. 2002) (in determining drug quantity accountability, a district court may rely solely on the testimony of cooperating co-conspirators).

We have considered Gonzalez's other arguments, some of which were raised for the first time on appeal, and find they are without merit. The judgment and sentence of the district court are affirmed.

_____