**UNITED STATES of America**

v.

**Denis RIVERA, Oscar Antonio Grande, Ismael Juarez Cisneros, Oscar Alexander Garcia–Orellana, Defendants.**

**No. CRIM.A. 04–283.**

United States District Court,
E.D. Virginia,
Alexandria Division.

April 8, 2005.

See also 412 F.3d 562.

Ronald Walutes, Esquire, Assistant United States Attorney, United States Attorney's Office, Patricia T. Giles, Esquire, Assistant United States Attorney, United States Attorney Office, Alexandria, VA, for Plaintiff.

Robert L. Jenkins, Jr., Esquire, Bynum & Jenkins, Alexandria, VA, David Preston Baugh, Esquire, Richmond, VA, James Clyde Clark, Esquire, Land Clark Carroll Mendelson & Blair, Alexandria, VA, Alexander N. Levay, Esquire, Moyes & Levay, Leesburg, VA, Jerome P. Aquino, Esquire, Alexandria, VA, Luis Felipe Restrepo, Esquire, Krasner & Restrepo, Philadelphia, Pa, Nina Ginsbeg, Esquire, DiMuro Ginsberg & Mook, Frank Salvato, Esquire, Alexandria, VA, for Defendants.

## MEMORANDUM ORDER

LEE, District Judge.

THIS MATTER is before the Court on Defendant Oscar Alexander Garcia–Orellana's Motion to Exclude Footnote Interpretation of Slang Terms in Transcripts and Defendant Denis Rivera's Motion to Strike Likely Government Exhibits and Incorporated Memorandum of Law (Docket No. 416). All four defendants are Spanish-speaking members of MS–13 or Mara Salvatrucha, a Hispanic youth gang. A federally certified court interpreter in the Spanish language, Maria Horvath, has translated various transcripts from Spanish into English for use at trial. Because many of the words in the transcripts are code words or slang used only by the gang, Ms. Horvath has provided footnote interpretation of many of these words or expressions. The issue before the Court is whether to exclude the interpretation of various gang code words or slang from transcripts the government intends to introduce at trial because, according to the defendants, Ms. Horvath is not an expert in gang language.

The Court holds that Ms. Horvath's qualifications as a federal court certified Spanish interpreter and her experience interpreting for MS–13 members render her qualified to provide opinions about the meaning of MS–13 slang found in thirty-five translated transcripts the government seeks to introduce in this case. *See* FED. R. EVID. 702. The Court will allow the footnote interpretations to remain on the government's transcripts, but it will require the addition of a disclaimer to any transcripts that go to the jury specifying that the definition of particular gang words is a fact in dispute that the jury may decide after considering all the evidence offered by the government and the defense. *See United States v. Gonzalez,* 365 F.3d 656 (8th Cir.2004), *vacated on other grounds* (detailing the procedure for admitting translations of words in drug code in a foreign language that are in dispute). The Court will allow the defendants to cross-examine Ms. Horvath about the substance and basis for her opinions, the transcript text, her knowledge of gang parlance and the footnotes she provided, during the government's case-in-chief. Additionally, during the defense's case-in-chief, the defense may offer expert testimony describing alternative or multiple interpretations of transcripts or gang parlance, including a glossary of multiple or alternative interpretations. The Court will not permit the government to introduce into evidence that Defendant Denis Rivera stipulated to the translation of

these transcripts in the Joaquin Diaz murder trial, because the Court holds that introduction of such evidence is more prejudicial than probative. *See* FED. R. EVID. 403.

The Court will instruct the jury that portions of transcripts offered by the government are in dispute and not binding upon them, that they are to consider and weigh evidence offered by the government and the defense concerning the proper interpretation of the MS–13 gang parlance, and that the jury must decide the question of what the gang words mean or which interpretation is the most reliable.

## ANALYSIS

### Standard of Review

■ Expert testimony is admissible under Federal Rule of Evidence 702 if the expert is qualified by knowledge, skill, experience, training, or education to opine about scientific, technical, or other specialized knowledge that will aid the jury or other trier of fact to understand or resolve a fact at issue. FED. R. EVID. 702. A court must further examine whether the reasoning or methodology underlying the expert's proffered opinion is reliable. *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 260 (4th Cir.1999)(citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590 n. 9, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Thus, an expert's testimony is admissible under Rule 702 if it rests on a reliable foundation and is relevant. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 143, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

A district court considering the admissibility of expert testimony exercises a gatekeeping function to assess whether the proffered evidence is sufficiently reliable and relevant. *Westberry,* 178 F.3d at 261. The Supreme Court has made clear, however, that a district court, in making its initial determination of whether proffered testimony is sufficiently reliable, has broad latitude to consider whatever factors bear on the validity of the unique circumstances to which expert testimony is involved. *Westberry,* 178 F.3d at 261 (citing *Kumho Tire Co.,* 526 U.S. at 150, 119 S.Ct. 1167).

### Discussion

*Ms. Horvath's Qualifications to Provide Interpretation of Gang Language*

■ The Court holds that Ms. Horvath is qualified to render opinions about MS–13 gang language because of her knowledge and experience interpreting for MS–13 gang members, her reliance on a variety of sources typically consulted upon by interpreters, and her knowledge and experience as a federal court certified Spanish interpreter. Ms. Horvath has worked in the federal courts for seventeen years. She translated in Defendant Rivera's first trial, with the agreement of both the prosecution and the defense in that case. *See United States v. Rivera,* 292 F.Supp.2d 827, 830 n. 6 (E.D.Va.2003); *see also* Def. Rivera's Mot. Ex. 1, Ms. Horvath's Mem. To assist her in interpreting in Defendant Rivera's first trial, she learned MS–13 terminology while interpreting for co-conspirators during attorney-client conferences, and she consulted an on-line glossary by former gang member Luis Rodriguez, glossaries of Spanish jargon, and various bilingual dictionaries. She also reviewed articles appearing in newspapers from El Salvador describing gang-activities and the vocabulary used by Salvadorean gangs, as well as contacting other interpreter colleagues for additional assistance.

Ms. Horvath has provided interpretation services for many MS–13 members (non-co-conspirators) in the past in trials, hearings, and attorney-client interviews, and she has prepared transcripts of Spanish speakers translated into English which

have been used in many federal court trials. She has interpreted for 567 cases in the Eastern District of Virginia. Ten of these cases involved MS–13 defendants. Ms. Horvath provided interpretation services on 51 occasions for MS–13 defendants, including preliminary detention hearings, bond hearings, initial appearances, pleas and motions hearings, according to a memorandum from Maria Hewitt, Division Manager of Operations for the Eastern District of Virginia, Alexandria Division, prepared for the Court. *See Attached Memorandum.* She has provided services for one trial. Because of her knowledge and experience, Ms. Horvath is qualified to render an opinion about the meaning of MS–13 language through the use of footnotes in the transcripts prepared for the Court.

*Confrontation Clause Issues*

■ The defendants' confrontation clause rights are unhampered by allowing Ms. Horvath to serve as an expert witness because she did not seek out particular MS–13 members to translate specific words or expressions in transcripts for her, thereby precluding the defendants from cross-examining witnesses against them who provided the meaning of those terms. During the course of providing interpretation services to other MS–13 gang members, she augmented her own vocabulary with these terms. She did not show any individual MS–13 members a transcript and ask them to translate it. Ms. Horvath's reliance on words and phrases she added to her vocabulary over time is easily distinguished from cases where courts have found defendants' Sixth Amendment rights were compromised because experts relied on other individuals' analyses without providing defendants the right to cross-examine them. *See, e.g., United States v. Tran Trong Cuong, M.D.,* 18 F.3d 1132, 1143 (4th Cir.1994)

(holding the government's medical expert could not rely on another doctor's report in forming his own opinion on proper medical practice without allowing for cross-examination of the non-testifying doctor). Instead, Ms. Horvath built up her own knowledge from attorney-client interviews and her interpretation services and applied it to the task of interpreting these transcripts. In the case of Defendant Rivera, the government has indicated that some of the words that are being challenged by the defense have been interpreted by Mr. Rivera himself. For example, one particularly contentious phrase that comes up in the transcripts is "charros churros." This expression has no literal translation into English. According to the government, Mr. Rivera has clearly defined the meaning of this phrase on a tape. No better evidence of what Mr. Rivera meant in using this phrase exists than Mr. Rivera's own explanation. In a situation where Mr. Rivera explained what he meant by a slang word on his own, neither his nor his co-defendants' confrontation clause rights are affronted.

■ Furthermore, even if Ms. Horvath did rely on hearsay, which the Court does not believe she did here, as she merely built up her own vocabulary and applied it, she is permitted to rely on hearsay in providing expert testimony. Federal Rule of Evidence 703 explicitly allows for an expert to consider facts or data not admissible in evidence in rendering an opinion, so long as they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." FED. R. EVID. 703; *see United States v. Dukagjini,* 326 F.3d 45, 57 (2d Cir.2003) (citing *United States v. Daly,* 842 F.2d 1380, 1387–88 (2d Cir. 1988)) ("[I]f experts in the field reasonably rely on hearsay in forming their opinions and drawing their inferences, the expert

witness may properly testify to his opinions and inferences based upon such hearsay"). Interpreters typically do research and ask questions to provide the best services they can to their clients. As Ms. Horvath testified at the Daubert hearing, she did research on-line and in books, augmented her vocabulary while providing services to other MS–13 gang members, and consulted other Spanish court interpreter colleagues. These are reliable methods for interpreters to use in preparing interpretative services.

*Procedure*

The Court has fashioned a procedure that will allow for the defendants to challenge any portions of transcripts that they disagree with. The Court will allow the defense to cross-examine Ms. Horvath and to present alternative translations of portions of transcripts through its own experts. In addition, the Court will provide a special instruction to the jury about how they should approach the transcripts during their deliberations. In designing the appropriate procedure to be used regarding words or expressions in dispute in this case, the Court has reviewed relevant caselaw addressing similar situations. *See, e.g., United States v. Gonzalez,* 365 F.3d 656 (8th Cir.2004), *vacated on other grounds,* 543 U.S. 1107, 125 S.Ct. 1114, 160 L.Ed.2d 1029 (2005). For example, in *Gonzalez,* the defendant challenged the government's translated transcripts which included drug code words as inaccurate, and argued that he should have been afforded an opportunity to present his translations contemporaneously with the government's translations. *Id.* at 659. The Eighth Circuit detailed the following procedure for introducing transcripts of wiretapped conversations at trial: first, the parties should try to stipulate to a transcript. Should the parties not agree on a stipulated transcript, "then each side

should produce its own version of a transcript or its own version of the disputed portions. In addition, each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version." *Id.* at 660 (internal quotations and citations omitted). As to the timing of the introduction of these alternative translations, the Eighth Circuit said that it was not reversible error to make the defendant wait until his case-in-chief to present his expert testimony and translation of wire intercepts. *Id.* So long as the defendant was given the opportunity to challenge the translation, the timing of the challenge is left to the district court's discretion. *Id.*

The Eighth Circuit also held that when drug code in a foreign language is involved, "the potential for prejudice is too great" to allow the usual leniency for translators to interpret words and phrases non-literally so that they make sense in English. *Id.* Instead, when a translator is interpreting foreign drug code, the party wishing to introduce the translation must ask the translator "to identify the English word that most closely captures the ordinary meaning of the foreign word. Then, the translator, if qualified as a drug code expert, or another witness with the requisite knowledge should be asked about his opinion regarding the contextual meaning of the word." *Id.* at 660–61. The Court then discussed what an appropriate instruction to the jury would be: "the crux of the appropriate instruction... is to inform the jury that it must determine the validity of the transcript presented." *Id.* at 662.

 Similarly, here, the Court notes that the defendants and the government disagree as to some portions of the transcripts, namely footnotes in transcripts of Defendant Rivera's phone conversations,

interpreting gang slang, code, colloquialisms, and the use of vernacular in the transcripts produced by the government.[1] Consequently, the Court has requested that the defendants objecting to these portions of transcripts prepare alternative translations. Thus far, only Defendant Garcia–Orellana has provided a glossary of terms to the Court. As the Eighth Circuit detailed in *Gonzalez*, the Court will permit each side to put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version. As to the timing of the introduction of these alternative translations, the Court will allow the defense to cross-examine Ms. Horvath about the substance and basis for her opinions, the transcript text, her knowledge of gang parlance and the footnotes she provided, during the government's case-in-chief. Additionally, the defense may offer expert testimony describing alternative or multiple interpretations of transcripts or gang parlance, including a glossary of multiple or alternative interpretations subject to cross-examination during the defense's case-in-chief. The defense, of course, must make showing that the proffered "expert" is qualified to render an opinion under Federal Rule of Evidence 702. Merely being a Spanish speaker, Spanish speaking lawyer or law student does not render one qualified to testify as an expert under Rule 702. This remains an issue for trial. The defense may not, however, put on its own expert testimony during the government's case-in-chief.

In addition, the government has indicated its intent to question gang members about the accuracy of the translations and will be permitted to do so. The government will not be permitted to notify the jury that Mr. Rivera stipulated to some of these translations in his first trial. The Court prohibits the government from doing so under Federal Rule of Evidence 403, because such a stipulation may have been a strategic decision by the defense in Mr. Rivera's first murder trial, significantly diminishing its probative value. Furthermore, the stipulation would have an unduly prejudicial effect on the co-defendants in this case; if the defendant who is speaking words in many of the recorded phone conversations has himself stipulated to the translation of these words in the past, it is virtually impossible, if not completely impossible, for co-defendants to challenge the translation of these transcripts. In addition, this Court, hearing a capital case involving four defendants, is not bound by rulings made in the prior murder case involving only one of the defendants. Finally, the government is required to prove every element of its case, and no defendant is required to stipulate to any element of the government's case.

The Court will also instruct the jury about how they should approach the transcripts with the following instruction:

> Some translations of words or expressions in the government's transcripts or footnotes to the transcripts are in dispute, that is, the parties do not agree on a particular interpretation. Thus, you,

---

1. The Court notes with dismay that the defendants' first untimely filed motion on this issue challenged only the footnote translations. The defendants were provided with these transcripts in August 2004. Defendant Rivera has had many of these transcripts since the Joaquin Diaz murder trial in 2002. In a pleading filed on Friday, April 1, 2005 a mere ten days before the start of trial, Defendant Garcia–Orellana expanded his challenge to the transcripts from footnotes alone to all colloquialisms and the use vernacular throughout the transcripts. Defendants have had these transcripts for many months and the deadline for filing motions in limine also occurred many months ago. The untimeliness of these motions is very close to "sandbagging."

the jury, will have to decide which interpretation you consider to be the correct one.

Ms. Maria Horvath is a government witness who has prepared transcripts for the government in this case. In situations where a particular interpretation is in dispute, the defense will have provided an alternative interpretation to you through their own expert witnesses.

In other words, when a particular interpretation is in dispute, you must consider and weigh alternative or multiple interpretations offered by government and defense witnesses. In making your determination, you must consider the interpretation offered, the factual basis for the interpretation, the knowledge or experience of the witness, and the familiarity of the witness with the words or gang parlance.

You must then decide for yourselves which interpretation is more credible or reliable. Then, you must give the transcript or disputed words such weight or value as you see fit.

## CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendant Oscar Alexander Garcia–Orellana's Motion to Exclude Footnote Interpretation of Slang Terms in Transcripts and Defendant Denis Rivera's Motion to Strike Likely Government Exhibits and Incorporated Memorandum of Law (Docket No. 416) are DENIED. The Court

DENIES Defendants' motion to strike the footnotes in the government's transcripts. Ms. Horvath is qualified to offer interpretations of MS–13 gang slang due to her numerous experiences serving as an interpreter for MS–13 gang members at trials, hearings and attorney-client interviews, as well as her study of sources of information normally relied upon by inter-

preters such as dictionaries, newspapers, and consultations with other interpreters and with gang members. Ms. Horvath is to be compensated as an expert witness for testimony and her time spent preparing her testimony for court and the government is required to disclose the terms of this compensation to the defense within three days of this Order. It is further

ORDERED that because the Court has qualified Ms. Horvath as an expert for the government, she may not serve as an interpreter in this case. The government may call Ms. Horvath as an expert witness to offer into evidence interpretations of gang parlance in transcripts of telephone conversations. In addition, it is

ORDERED that the defense is permitted to cross-examine Ms. Horvath about the substance and basis for her opinions, the transcript text, her knowledge of gang parlance and the footnotes she provided. Additionally, the defense may offer expert testimony describing alternative or multiple interpretations of transcripts or gang parlance, including a glossary of multiple or alternative interpretations subject to cross-examination in the defense's case-in-chief. Further, it is

ORDERED that the government may not mention or introduce into evidence that Mr. Rivera stipulated to the translations of several of the transcripts in his first trial.

The Court DIRECTS the government to attach the following instruction to all transcripts submitted to the jury and the Court will similarly instruct the jury:

Some translations of words or expressions in the government's transcripts or footnotes to the transcripts are in dispute, that is, the parties do not agree on a particular interpretation. Thus, you, the jury, will have to decide which inter-

pretation you consider to be the correct one.

Ms. Maria Horvath is a government witness who has prepared transcripts for the government in this case. In situations where a particular interpretation is in dispute, the defense will have provided an alternative interpretation to you through their own expert witnesses.

In other words, when a particular interpretation is in dispute, you must consider and weigh alternative or multiple interpretations offered by government and defense witnesses. In making your determination, you must consider the interpretation offered, the factual basis for the interpretation, the knowledge or experience of the witness, and the familiarity of the witness with the words or gang parlance.

You must then decide for yourselves which interpretation is more credible or reliable. Then, you must give the transcript or disputed words such weight or value as you see fit.

The Clerk is directed to forward a copy of this Order to counsel of record.