**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3811-15T2
       A-4893-15T1

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

MARSHA G. BERNARD, a/k/a
MARSHA GAY BERNARD,

  Defendant-Appellant.

_____

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

ANDREW DAVIS, a/k/a FLIPPA
MAFIA, FLIPPA MOGGELA,
DJ, and JOHN,

  Defendant-Appellant.

_____

    Submitted February 6, 2019 (A-3811-15) and Argued
    telephonically February 8, 2019 (A-4893-15) –
    Decided May 1, 2020

Before Judges Ostrer, Currier and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 14-01-0003.

Joseph E. Krakora, Public Defender, attorney for appellant Marsha G. Bernard (Richard Sparaco, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent in A-3811-15 (Sarah Lichter, Deputy Attorney General, of counsel and on the brief).

Robin Kay Lord argued the cause for appellant Andrew Davis.

Sarah Lichter, Deputy Attorney General, argued the cause for respondent in A-4893-15 (Gurbir S. Grewal, Attorney General, attorney; Sarah Lichter, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

In these back-to-back appeals, consolidated for purposes of this opinion, defendants Andrew Davis and Marsha Bernard challenge their convictions of first-degree conspiracy to distribute cocaine and financially facilitate criminal activity, N.J.S.A. 2C:5-2, N.J.S.A. 2C:21-25, and N.J.S.A. 2C:35-5; first-degree distribution of cocaine, N.J.S.A. 2C:35-5; and lesser-included second-degree financial facilitation of criminal activity (money laundering), N.J.S.A. 2C:21-

leader of a narcotics trafficking network, N.J.S.A. 2C:35-3; and Davis appeals from the court's order, granting the State's motion to retry him. Defendants also challenge their sentences – an aggregate twenty-one years, with six years of parole ineligibility for Bernard, and an aggregate twenty-five years, with twelve years of parole ineligibility for Davis.

We affirm.

I.

The State contended that Davis and Bernard, with the help of others, imported eighteen kilos of cocaine into New Jersey and then distributed the drugs here. The State alleged Davis led the operation and directed Bernard and other co-conspirators, including Davis's brother Kemar,[1] to mail the cocaine from California, receive the packages in New Jersey, deliver cocaine to dealers, and collect money. The case against Davis and Bernard consisted of the testimony of former associates, who stated they distributed drugs for Davis; police officers who described their surveillance of drug transactions involving or connected to defendants, and the seizure of drugs and cash; and extensive

---

[1] To avoid confusion, we will refer to Kemar by his first name, and Andrew Davis by his last name; and we mean no disrespect in doing so.

recorded conversations, in which Davis and Bernard discussed their drug distribution activities. In most of the calls, the participants spoke Jamaican Patois, an English-based dialect that required translation or interpretation to be understood by English speakers unfamiliar with its pronunciation, sentence structure, and vocabulary.

The State presented evidence regarding several separate transactions involving one or both defendants. In August 2012, in the course of intercepting phone calls of another suspected drug distributor, George Jones, Millville Police learned that Jones had arranged to purchase a large amount of cocaine from his "Jamaican supplier." Police also learned that an associate, Gregory Spence, was directed to pick up the cocaine and deliver it to Jones at a Holiday Inn.

Testifying for the State, Spence said that on the appointed date, he picked up Kemar at the airport, and went to Davis's apartment, where four boxes of cocaine were received. Davis told him to take "ten" to "G," meaning ten kilograms to George Jones. When Spence returned to meet Jones at the hotel, police arrested both of them and recovered ten kilograms of cocaine from Spence's car and over $400,000 from Jones's hotel room. Spence testified he had transported cocaine and conducted transactions on Davis's behalf since 2011; and he gave drug sale proceeds to Bernard when Davis was unavailable.

A-3811-15T2

In the months following the hotel seizure, based on information obtained from a confidential informant, State Police Detective Erik Hoffman obtained warrants to retrieve and record communications of Davis's and Kemar's cellphones.

In early January 2013, an officer assigned to interdict drugs at Los Angeles International Airport (LAX) conversed with Kemar as he walked through the terminal. As we discuss in greater detail in connection with defendants' suppression motion, police ultimately uncovered over $140,000 in cash hidden in Kemar's suitcase. In the months that followed, investigators obtained additional warrants to intercept calls to and from Kemar's and Bernard's cellphone.

In February 2013, Davis called Kemar to ask about a package that was supposed to arrive at a Vineland address from California. Kemar called the post office, falsely identified himself as Peter Williams, the sender, and was told that the package was en route. Police intercepted the package and discovered several kilos of cocaine hidden inside CD cases covered in wrapping paper. When Kemar again called the post office, the postal employee, as directed by police, told him the package could not be delivered due to an insufficient address. Kemar reported this to Davis, who told him to obtain a fake driver's license in the name of Peter Williams, so he could retrieve the package as its sender. After

repeated calls, a postal employee eventually told Kemar the package was in a "dead mail recovery center" in Atlanta. Kemar told Davis that he "don't like how that sound[ed]." When informed of that, Davis instructed him to abandon the package and change his phone number.

The State also presented evidence of multiple phone calls in February and March 2013 involving Kemar, Bernard, and Davis, pertaining to a drug buyer's complaint that a kilo of cocaine was "handicapped" and "bent." The calls reflected defendants' involvement in the distribution of drugs, particularly to the buyer.

Another Davis cohort, Shellyann Brown, testified that, beginning in April 2012, she received or picked up packages for Davis and gave them to Bernard, who paid her for her service. In March 2013, Kemar talked to Brown about another package she was supposed to receive in Hamilton from California. Police intercepted the package, found cocaine inside, and asked the post office to update the tracking information to "status not updated." Later, Brown was informed the package leaked and was deemed hazardous. In subsequent conversations, Kemar and Davis disbelieved the report and suspected someone had stolen the package. Brown thereafter gave Kemar a different address to use. After a package was sent there, police watched Brown give it to Bernard.

6

Davis called Bernard and told her to open the package and take "one" to Angel Rivera and "two" to James McBride. Bernard asked Sidonie McLeod to make the delivery to McBride at a Kmart in Moorestown. Police watched McLeod do so, but did not intercede. Bernard told Davis that McBride paid "forty-nine" for the "two" McLeod gave him.

Also in March 2013, Bernard contacted Rivera and asked him to meet in the parking lot of the Red Lobster restaurant near the Cherry Hill Mall. Bernard brought a shopping bag from one of the mall's stores to the parking lot and handed it to Rivera, who put it in his car and entered the restaurant. Police arrested him in the restaurant, and recovered the shopping bag. They found cocaine inside, covered in birthday wrapping paper, and a receipt in Bernard's name from the store that produced the shopping bag.

Later that month, Kemar and Davis talked about the expected delivery of another package from California to a Princeton address Brown provided. Police watched the delivery. After she received it, Brown called Bernard, who picked it up. Bernard then called McBride to say she would deliver it to him around 7:00 that night. During that call, McBride said that Davis told him to "come see" Bernard.

7

Bernard gave the package to McLeod to take to McBride. Police followed McLeod, watched her hand the box to McBride, and then arrested the two. The package contained cocaine and bore the delivery address Brown gave Kemar. Bernard was arrested the same day, as were Brown and Kemar, who was in California at the time. Davis was later arrested in California.

Defendants were indicted along with Kemar, Brown, and several others, but defendants were tried together. As we noted, the jury found defendants guilty of conspiracy, cocaine distribution, and money laundering, but was hung on the leader charge against Davis. We will review the details of the court's sentence when we discuss defendants' excessive-sentence arguments.

Davis presents the following points for our consideration:

POINT ONE

THE COURT'S JURY INSTRUCTION THAT THE STATE'S TRANSLATIONS OF PHONE CALLS CONDUCTED IN JAMAICAN PATOIS WERE CORRECT IMPROPERLY INVADED THE PROVINCE OF THE JURY, THEREBY DEPRIVING DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

POINT TWO

THE MONEY LAUNDERING CONVICTION MUST BE VACATED BECAUSE THE STATE FAILED TO PROVE THAT DEFENDANT COMMITTED AN ACT OF MONEY LAUNDERING SEPARATE FROM

8

THE DRUG SALES BY WHICH THE MONEY WAS OBTAINED.

POINT THREE

THE ORDER DENYING DEFENDANT'S MOTION TO DISMISS COUNT TWO, FIRST-DEGREE LEADER OF A NARCOTICS TRAFFICKING NETWORK, AND GRANTING THE STATE'S MOTION FOR RETRIAL MUST BE REVERSED BECAUSE RETRIAL ON THAT COUNT IS PRECLUDED BY THE DOUBLE JEOPARDY CLAUSE OF THE NEW JERSEY CONSTITUTION.

POINT FOUR

THE COURT'S FAILURE TO DECLARE A MISTRIAL OR AT A MINIMUM TO VOIR DIRE THE JURY AFTER A JUROR INFORMED THE COURT THAT SHE COULD NO LONGER DELIBERATE "WITH A CLEAR HEAD," DENIED THE DEFENDANT HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL.

POINT FIVE

THIS COURT SHOULD REVERSE THE DENIAL OF DEFENDANT'S MOTION TO SUPPRESS ELECTRONIC EVIDENCE BECAUSE THE CAPTURE OF DEFENDANT'S CELL PHONE CONVERSATIONS FROM DECEMBER 13, 2012 ONWARD UNLAWFULLY UTILIZED THE CELL PHONE TOWER FACILITY OF A FOREIGN NATION (JAMAICA).

9

POINT SIX

THE POLICE DID NOT HAVE SUFFICIENT BASIS TO DETAIN KEMAR DAVIS, AND ALL EVIDENCE RESULTING FROM THE WARRANTLESS SEARCH OF HIS LUGGAGE SHOULD HAVE BEEN SUPPRESSED.

POINT SEVEN

A QUALITATIVE WEIGHING OF THE AGGRAVATING AND MITIGATING FACTORS DOES NOT SUPPORT THE IMPOSITION OF AN AGGREGATE SENTENCE OF 25 YEARS WITH 12 YEARS OF PAROLE INELIGIBILITY.

Bernard presents the following points for our consideration:

POINT I – THE EVIDENCE SEIZED FROM KEMAR DAVIS AT LOS ANGELES INTERNATIONAL AIRPORT SHOULD HAVE BEEN SUPPRESSED.

POINT II – THE COURT ERRED IN NOT GRANTING DEFENDANT'S MOTION TO DISCLOSE IDENTITY OF CONFIDENTIAL INFORMANT.

POINT III – THE TRIAL COURT INVADED THE PROVINCE OF THE JURY AS FACT-FINDERS IN ITS JURY INSTRUCTION THAT THE COURT HAS ALREADY FOUND THAT THE TRANSCRIPTS OF THE INTERCEPTED PHONE CALLS WERE A CORRECT TRANSLATION.

POINT IV – THE TRIAL COURT SHOULD HAVE GRANTED DEFENDANT'S MOTION FOR A MISTRIAL DUE TO THE STATE'S FAILURE TO PROVIDE DISCOVERY OF STATEMENTS MADE

10

BY DEFENDANT THAT LATER FORMED THE BASIS FOR THE OPINION THAT THE DEFENDANT'S VOICE WAS ON THE RECORDED CONVERSATIONS.

POINT V – DEFENDANT'S SENTENCE OF TWENTY-ONE YEARS WITH SIX YEARS PAROLE INELIGIBILITY WAS EXCESSIVE BECAUSE THESE CONSTITUTED HER FIRST ARREST AND CONVICTIONS.

We first address the jury instruction and suppression issues, which both defendants raise.

## II.

Defendants argue the court usurped the jury's fact-finding role, and denied defendants a fair trial, by instructing the jury that the transcript translating the wire-tapped conversations presented at trial were "correct." We disagree. Defendants invited the process by which the court found, after hearing from its own expert, what was the correct transcription of the taped conversations. And, even if defendants did not invite the court's finding, we are unconvinced the judge's instruction on the transcript's correctness denied defendants a fair trial. See R. 2:10-2. That is so for two reasons. First, the judge also instructed the jury that it should decide whether the transcripts were correct. Second, defendants identified no alleged errors in the transcript that caused them prejudice.

11

A.

As already noted, the State significantly relied on recorded conversations involving defendants and Kemar speaking Patois. The dialect is English-based, but employs special idioms and usages that may not be understood by non-speakers. There is no accepted Patois-to-English dictionary. Words in Patois develop and change over time (as do most languages).

The State proposed before trial to allow the jury to use the transcripts, prepared by a State Police Patois expert, as aids when listening to the recorded conversations. But, unlike in a case involving purely English recordings, the aid was not intended merely to assure that the jury did not miss a word; it was intended to assure that the jury understood the meaning of the words used. However, the transcript did not involve a word-for-word translation. Rather, it apparently constituted an interpretation as well.[2]

---

[2] We cannot ascertain the extent to which interpretation exceeded word-for-word translation, in part because the record does not include the actual recordings, or a word-for-word transcription of them. Furthermore, defendants have not identified any Patois words derived from a non-English language, which required an intermediate translation into English, before a final translation as to its meaning. In that respect, the translation was unlike a Spanish recording that first had to be translated into English words, some of which themselves had to be translated because they were drug code or slang. See United States v. Gonzalez, 365 F.3d 656, 660-61 (8th Cir. 2004).

Davis's counsel stated that he "requested . . . that the Court appoint an interpreter for purposes of the <u>Driver</u> hearing."[3]   Arguably, Davis's counsel expressly agreed to be bound by the court-appointed expert's interpretation. During the pre-hearing colloquy, Davis's counsel said that once the State and defense were heard on a particular disputed portion of the interpretation, the "court interpreter . . . would be the final say."

Once appointed, the expert reviewed each State-prepared transcript that the State proposed to present at trial.  After hearing the original wire-tapped conversation or reviewing the captured text message, the expert offered her view.  In many cases, the expert approved of the State's translation; in some cases, the interpreter suggested minor modifications after hearing from counsel. None of the changes appeared to alter drastically the recorded conversation's overall meaning, and some translations seemed apparent from the context.  For example, the expert explained that "drop" meant to "deliver" something; "shoot"

---

[3] <u>State v. Driver</u>, 38 N.J. 255 (1962).  A court at a <u>Driver</u> hearing typically determines the admissibility of a sound recording – as distinct from its translation – in light of such factors as whether "(1) the device was capable of taking the conversation or statement, (2) its operator was competent, (3) the recording is authentic and correct, (4) no changes, additions or deletions have been made, and (5) in instances of alleged confessions, that the statements were elicited voluntarily and without any inducement."  <u>Id.</u> at 287.  <u>See also</u> <u>State v. Nantambu</u>, 221 N.J. 390, 395 (2015) (stating "reliability is the decisive factor in determining the admissibility of a recording").

meant "send"; "my mind just run on you" meant "I was thinking about you"; "milk out" meant "used up"; "ray ray" meant "whatever, whatever"; "buff up" meant "break" or "destroy"; and to "reach" meant to arrive at a location. The trial court made clear that defendants retained the right to present their own expert to testify at trial about disputed sections of the transcript. However, defendants did not do so.

Before trial, the judge stated that he intended to instruct the jury that a court-appointed, Jamaican Patois interpreter reviewed and in some cases revised the transcripts, and "[f]ollowing this court-supervised evaluation, those transcripts have been determined to be accurate translations of the recordings." Both defense counsel objected on the grounds that, by sharing its finding, the court infringed on defendants' right of confrontation. The court rejected Davis's counsel's request that the court use the charge on oral statements, and rejected Bernard's counsel's request that the court substitute "permissible" for "accurate." Without waiving his objections, Davis's counsel suggested the court substitute "correct" for "accurate," which the court did. The judge later stated he would instruct the jury that "[w]hat the words mean [was] something that they [would] have to consider."

14

At trial, before the State began to play selected calls for the jury, the court instructed the jury:

> Members of the jury, a copy of the tape has been marked into evidence. That is the evidence that you should consider.
>
> The State's evidence in th[i]s case includes numerous phone calls and text messages intercepted through various wiretaps, many of which are in Jamaican Patois, a slang or jargon that has developed in that country.
>
> Using investigators fluent in Patois, the State has prepared transcripts of these recordings and messages.
>
> Prior to trial at a hearing, those transcripts were reviewed and, in some instances, revised by a Court-appointed interpreter who is fluent in Patois.
>
> Following this Court's supervised evaluation, the transcripts have been determined to be a correct translation of the recordings.

After a sidebar conversation, the court added:

> Again, you're being provided with what we refer to as "listening aids" that you're – they're going to play tapes, which substantially will be in Patois.
>
> These are for your guidance to listen to the tapes. The tapes control what you listen to.

At another side bar, defense counsel objected to Hoffman stating what he found important in certain recorded statements. The court then added the instruction:

A-3811-15T2

At the end of the day, the jury has to make a determination of all of the facts. You are the finder of facts, and you have to analyze the tapes that will be played to you. And, that is ultimately your province. And, that's the important thing for you to consider as we go forward.

The court overruled defendants' continuing objection, stating they could call their own expert to challenge the transcripts' accuracy.

The transcripts were not formally entered into evidence and were not permitted into the jury room. At trial, the State's Patois expert testified about the translations and defendants cross-examined him as to their accuracy. He agreed that Patois is an evolving dialect and that the meaning and interpretation of words may vary depending on several factors. He also conceded that he left Jamaica at age nine and had only visited there infrequently in the twenty-six years since. He testified that his translations of the intercepted calls were "interpretations of what was being said" because a word-for-word translation into English would be "impossible." He agreed there are multiple ways of saying the same thing in Patois and that some Patois words have several meanings. He said he tried to put the words used by the speakers in the calls into context.

Defense counsel also cross-examined other witnesses about the nature of Patois as a variable, fluid dialect. For example, Spence testified that there were no Patois dictionaries and that the dialect was not taught in Jamaican schools.

16

State Police Detective Hoffman said that he relied on the State Police expert's interpretations, and that it was "not for [him]" to consider whether the differences in sentence structures between Patois and English were significant.

Counsel and the judge returned to the issue of the court's instruction multiple times during trial, with defense counsel objecting to the court stating its finding regarding the translations. The judge rejected the suggestion to substitute "fair" for "correct" (but, as noted below, he did use that word in one instance). He stated he would add a sentence to instruct the jury that it was the final arbiter of the recordings' meaning.

In summation, Davis's counsel stated that the jurors should focus on the words spoken on the tapes, because the translated transcripts were "not evidence." She emphasized that Patois is a highly variable "slang language" without dictionaries, and urged jurors to make their own determination as to the content of the phone calls because the interpretations and translations were not necessarily "what really was said."

In its final instructions, the court repeated its mid-trial instruction, stating both that the court found the transcript "correct," but the jury was the final arbiter of the facts:

> The State's evidence in this case included numerous phone calls and text messages through various wiretaps,

many of which are in Jamaican Patois, a slang or jargon that has developed in that country.

Using investigators fluent in Patois, the State has prepared transcripts of these recordings and messages.

Prior to trial, at a hearing, these transcripts were reviewed and, in some instances, revised by a Court-appointed interpreter who is fluent in Patois.

Following this Court's supervised evaluation, the transcripts have been determined to be a correct translation of the recordings.

However, as finders-of-fact, it is up to you, and you alone, as the sole and exclusive judges of the facts in evidence, to determine what was said and by whom, as well as the meaning of the words and the intent of the speakers.

Later, the court instructed the jury how to properly evaluate defendants' alleged oral statements, and "consider[] whether or not the statements . . . is [sic] as the State alleges." In so doing, the court characterized the transcripts as "fair" as opposed to "accurate." The judge stated, "I specifically instruct you that it is the tapes, themselves, that are the evidence and not the transcripts, which, after pre-trial consideration, have been determined to be a fair aide [sic] in your deliberation[s]."

B.

Well-settled principles govern a claimed error in a jury instruction. "[A]dequate and understandable jury instructions" are essential to a fair trial. State v. Afanador, 151 N.J. 41, 54 (1997). For that reason, "[e]rroneous instructions are poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error." Ibid. Nonetheless, in order to reverse where a defendant has objected to a charge, "there must 'be some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached.'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)). "[A]ny alleged error also must be evaluated in light 'of the overall strength of the State's case.'" State v. Burns, 192 N.J. 312, 341 (2007) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

We also review a jury instruction as whole, State v. Delibero, 149 N.J. 90, 107 (1997), particularly if the judge erred in one part of the charge, but correctly instructed the jury elsewhere, State v. McKinney, 223 N.J. 475, 496 (2015). A court may find an error harmless based on "'the isolated nature of the transgression and the fact that a correct definition of the law on the same charge is found elsewhere in the court's instructions.'" Baum, 224 N.J. at 160 (quoting

19

State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)); see also State v. Medina, 147 N.J. 43, 55 (1996) (declining to reverse based on judge's erroneous explanation of State's burden of proof where "[i]mmediately after delivering the offending clause, the court provided a more accurate explanation of the State's burden"). The court may also determine that reversal is unwarranted if instructions are "not so much incorrect as they were capable of being improved." Delibero, 149 N.J. at 106. Finally, a court may disregard a flaw in the judge's instruction if the defendant invited or encouraged it. See State v. A.R., 213 N.J. 542, 561-62 (2013) (stating that, absent a fundamental injustice, an appellate court may not reverse based on trial court errors that defense counsel induced or encouraged, or to which counsel consented); State v. Ramseur, 106 N.J. 123, 282 (1987) (applying the invited error doctrine to the defendant's request for specific jury instructions).

As a procedural matter, it was appropriate for the court to conduct a hearing to determine the accuracy of the transcripts. Our courts have recognized that "a transcript may be used as an aid for understanding a tape recording." State v. DeBellis, 174 N.J. Super. 195, 199 (App. Div. 1980). However, characterizing a transcript as a mere aid makes sense only when the jury can on its own discern the recording's meaning. "[A] jury cannot very well follow the

tapes where they conflict with translations if the jury does not understand the language of tapes. In such circumstances, it may make more sense to treat translations of transcripts of non-English-language conversations, as well as the tapes, as 'evidence.'" In re Audibility of Certain Recorded Conversations, 691 F. Supp. 588, 592 (D. Conn. 1988); see also United States v. Fuentes-Montijo, 68 F.3d 352, 355 (9th Cir. 1995) ("[W]hen faced with a taped conversation in a language other than English and a disputed English translation transcript, the usual admonition that the tape is the evidence and the transcript only a guide is . . . nonsensical[.]").[4]

One court has held that using a transcript is "analogous to the use of expert testimony as a device aiding a jury in understanding other types of real evidence." United States v. Onori, 535 F.2d 938, 947 (5th Cir. 1976); see also United States v. Cruz, 765 F.2d 1020, 1023 (11th Cir. 1985) (explaining that a jury must rely on a transcript as substantive evidence where it cannot understand the foreign language recording). In this respect, the translation of a foreign language recording is akin to an expert interpretation of drug code and other

---

[4]  The court also stated that describing the transcript as a mere aid "has the potential for harm," where at least one juror speaks the foreign language in a recording, and could translate the recording differently from the experts, and may also serve as a jury-room expert. Id. at 355. Notably, in this case, jury selection assured that no Jamaican Patois speaker was empaneled.

expressions a jury may not understand.  See State v. Hyman, 451 N.J. Super. 429, 446 (App. Div. 2017) (discussing need for opinion testimony to illuminate "drug slang or code words [that] remain beyond the average juror's understanding").  The court's preliminary hearing assured that the transcript presented to the jury met a reasonable standard of accuracy.  As the First Circuit Court of Appeals has observed, "Where inaccuracies in the transcript combine with possible bias in the transcription process, a transcript may be excluded from evidence."  United States v. Font-Ramirez, 944 F.2d 42, 48 (1st Cir. 1991).

Many federal appellate courts have endorsed a procedure by which the trial judge encourages the parties to stipulate to a single transcription; and if that is not possible, then the prosecution should be permitted to offer its qualified expert's opinion about the recording's meaning, followed by the defendant's expert's opposing view.  See e.g., United States v. Rengifo, 789 F.2d 975, 983 (1st Cir. 1986) (stating the district court should "try to obtain a stipulated transcript from the parties" and "[f]ailing such stipulation, each party should be allowed to introduce its own transcript of the recording provided that it is properly authenticated"); United States v. Llinas, 603 F.2d 506, 509 (5th Cir. 1979) (stating that if the court cannot secure the parties' stipulation to a common transcript, "then each side should produce its own version of a transcript or its

own version of the disputed portions" and may introduce evidence supporting its version or challenging the opponent's (quoting United States v. Wilson, 578 F.2d 67, 70 (5th Cir. 1978))); see also Gonzalez, 365 F.3d at 660; United States v. Zambrana, 841 F.2d 1320, 1336 (7th Cir. 1988); Cruz, 765 F.2d at 1023 (following Llinas).

The court here opted instead to appoint its own expert, to ascertain whether the transcript was accurate and presentable to the jury. We find no error in doing so, where defense counsel expressly requested that procedure, and the State consented.

Federal cases hold that a defendant may not complain about the court's decision to admit a transcript, or to permit a jury to consider it, if the defendant has not presented evidence to challenge the government's evidence supporting its version. See United States v. Franco, 136 F.3d 622, 626 (9th Cir. 1998) (holding that the district court correctly concluded that "defendants had not placed the accuracy of the transcripts in issue" where defendants "submitted no competing translations"); Zambrana, 841 F.2d at 1335 (stating defendant may not complain about use of government's transcript "[b]ecause defendants had ample opportunity to either challenge specific portions of the government's transcript or to prepare an alternate version"); Cruz, 765 F.2d at 1023 (stating

that defendant "'cannot complain on appeal that the jury's fact-finding function was usurped when he failed to present evidence which would have aided the jurors in fulfilling [the] function'" of assessing the transcript's accuracy (quoting Llinas, 603 F.3d at 510)).

However, at issue in cases like Franco, Zambrana, and Cruz was the threshold admissibility of the transcripts. The court rejected defense arguments that the prosecution's transcripts should not have been presented to the jury at all because of alleged inaccuracies. Franco, 136 F.3d at 628; Zambrana, 841 F.2d at 1335; Cruz, 765 F.2d at 1023; see also Font-Ramirez, 944 F.2d at 48 (holding the court appropriately admitted a transcript where the defendant "did not offer an alternative transcript and did not point out any specific inaccuracies in the government's transcript").

Even if a defendant does not present an alternative translation, he or she may still challenge the accuracy of the transcript the government presents to the jury. To require a defendant to present an expert or an alternative translation, as a pre-condition to contesting the accuracy of the government's translation, would improperly impose upon the defendant a burden to produce evidence. However, a defendant "has no burden to come forward with one scintilla of

evidence." State v. Loftin, 146 N.J. 295, 389 (1996) (approving jury instruction that defendant has no burden to present evidence).

Multiple federal circuit courts of appeal have held that the interpretation of a foreign-language recording is a fact issue for the jury. See Gonzalez, 365 F.3d at 661; Zambrana, 841 F.2d at 1337 (stating "it is more properly the function of the finder-of-fact to weigh the evidence presented by the parties as to the accuracy of the proffered translation and to determine the reliability of the translation on the basis of that evidence"); see also Franco, 136 F.3d at 628; Rengifo, 789 F.2d at 983.

Where a transcript's accuracy is disputed, federal courts have held that the trial judge should instruct the jury that it is obliged to resolve the factual dispute. See Gonzalez, 365 F.3d at 661-62 (reviewing Eighth and Seventh Circuit model criminal jury charges, which direct the jury to determine the accuracy of the transcript); Franco, 136 F.3d at 626 (affirming conviction where trial court instructed that the transcripts were "evidence subject to objections" and "transcripts or portions of the transcripts may have to be evaluated by you for accuracy, and you may accept, reject, or partially accept and reject the transcript's accuracy"); Rengifo, 789 F.2d at 983 (stating that "[w]hen the jury receives two transcripts of the same recording, it should . . . be instructed

that there is a difference of opinion as to the accuracy of the transcripts and that it is up to them to decide which, if any, version to accept").

The judge in this case duly recognized that the interpretation of the recorded wire-tapped conversations was a fact issue; and that it was the jury's role, ultimately, to resolve that issue. The court appropriately instructed the jury that "as finders-of-fact, it is up to you, and you alone, as the sole and exclusive judges of the facts in evidence, to determine what was said and by whom, as well as the meaning of the words and the intent of the speakers."

The court's misstep was to share with the jury the court's own preliminary finding. Doing so risked influencing the jury in making its own finding. See State v. Ross, 229 N.J. 389, 416 (2017) (Timpone, J., dissenting) (noting the potential harm "[w]hen a judge drifts from being a pillar of neutrality"). Just as a judge should not disclose its preliminary finding as to the admissibility of a defendant's statement as voluntary, see State v. Hampton, 61 N.J. 250, 272 (1972), the judge here should not have told the jury that he found the transcript to be "correct" and "fair."[5]

---

[5] We recognize that in Fuentes-Montijo, the court rejected a defendant's challenge to a trial judge's instruction that directed the jury to accept an English transcript of Spanish recordings presented at trial. 68 F.3d at 353. The trial judge stated, "You are not free to reject the accuracy of the interpretation of the

Nonetheless, we decline to reverse on this basis. Davis's counsel evidently agreed to be bound by the court's expert. Davis may not argue now that the court improperly instructed the jury that the court found the expert's version correct and fair. However, even if Davis's counsel meant only to agree the State could use the court's expert's version at trial, without waiving the right to challenge it before the jury, the charge as a whole did not deny Davis or Bernard a fair trial.

Although the judge's statement about his finding risked unduly influencing the jury, the statement was true. And the judge clearly instructed the jury that assessing the transcript's accuracy was ultimately a question for the jury. Taken as a whole, the instruction was inartful, but not incorrect.

Most importantly, defendants failed to demonstrate that the judge's statement caused them prejudice. They failed to identify any inaccuracies in the transcript that the judge's statement may have dissuaded the jury from finding.

tape recordings differently than the interpretation given by the certified court interpreter in the transcripts." Id. at 354. However, the case does not persuade us that a trial judge generally should declare a transcript accurate. The Court of Appeals noted that, absent the instruction, one or more bilingual jurors could have shared that with the jury "unknown to the parties." Id. at 355. Secondly, the defendant arguably stipulated that the transcripts were true and accurate. Id. at 353.

Nor have they shown that any such inaccuracies were so significant that they could have affected the verdict in light of other evidence of guilt. Other courts have declined to disturb convictions where a defendant complained generally that the jury considered an inaccurate transcript, but failed to identify the inaccuracies or how they prejudiced the defendant. See Fuentes-Montijo, 68 F.3d at 355 (finding no abuse of discretion in instructing the jury that the transcripts were accurate where defendants failed to identify inaccuracies that likely affected the verdict); United States v. Pena-Espinoza, 47 F.3d 356, 360 (9th Cir. 1995) (affirming where court was "left with largely conclusory allegations of possible inaccuracy and no indication that the court's ruling [allowing readers of translations] likely affected the jury's verdict"); cf. Franco, 136 F.3d at 628 (holding there was no reversible error in allowing the transcripts in the jury room "when there is no cognizable dispute concerning the accuracy of the translation").

In sum, we reject defendants' argument that the court's jury instruction denied them a fair trial, requiring reversal.

Defendants contend the court erred in declining to suppress over $140,000 in currency seized from Kemar at LAX.[6] They assert an officer detained Kemar without reasonable suspicion.

We reject these arguments. Applying our deferential standard of review, see State v. Elders, 192 N.J. 224, 243 (2007), we discern no basis to disturb the trial court's fact-findings reached after a testimonial hearing, including its finding that Kemar voluntarily spoke to the officer and consented to a search of his luggage. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1974) (stating that voluntariness of consent is a factual issue). As we review issues of law de novo, see State v. Gamble, 218 N.J. 412, 425 (2014), we independently conclude that Kemar was not unlawfully detained under the circumstances. See United States v. Mendenhall, 446 U.S. 544, 554-55 (1980) (opinion of Stewart, J.) (stating that characterization of incident as an investigatory stop is a legal question); United States v. Montilla, 928 F.2d 583, 588 (2d Cir. 1991) (stating "the Supreme Court's own practice suggests strongly that it views the seizure issue as a legal question"); United States v. Maragh, 894 F.2d 415, 417-18 (D.C.

---

[6] In a supplemental brief, the State concedes that defendants had standing to file their motion.

Cir. 1990); <u>State v. Cryan</u>, 320 N.J. Super. 325, 328 (App. Div. 1999) (stating that a court conducts plenary review of court's application of the law to the facts in a suppression motion).

The sole suppression hearing witness was Los Angeles Sheriff's Office detective Steve Anderson. He was assigned to an LAX task force to stop drug couriers. He explained that if he had no prior tip about an arriving courier, he would simply approach people and ask to speak to them. Sometimes, he did so randomly. Other times, he had a hunch the person was involved in criminal activity, as when he approached Kemar. Kemar arrived on a flight from Philadelphia, a major drug destination; he repeatedly looked over his shoulder as he left the secure arrival area and entered baggage claim; he evidently made multiple calls on his cellphone; and he appeared nervous.

Dressed in plain clothes with his weapon concealed, Anderson introduced himself as a narcotics officer, displayed his badge and identification, and asked Kemar if he would agree to answer "security questions." Anderson assured Kemar that he was "not in any trouble, was not under arrest," but he did not expressly tell him he could refuse to answer. Anderson testified that he would not have restrained Kemar if he had refused, or walked away; but, Kemar consented.

Kemar said he traveled to Los Angeles on a one-way ticket that his sister bought the previous week. He said he was there to visit friends and family, but he did not know who would pick him up, where he would stay, or when he would leave. Asked if he possessed a large amount of money, Kemar said he had a few hundred dollars. Anderson noticed several hundred-dollar bills in Kemar's wallet when he produced his driver's license, but did not think that was significant for a traveler.

Anderson asked Kemar if he could check his bag, which Kemar had retrieved from the baggage carousel. Kemar agreed. A sergeant standing several feet away performed the search. He discovered that Kemar's bag enclosed a second bag; and there was fresh glue and a bulge in the bag's interior walls. That indicated someone had opened and resealed them, perhaps to secrete cash or contraband. Anderson also noticed a bulge in Kemar's coat pocket the size of another wallet. Anderson again asked Kemar about money he was carrying. Kemar then said he had about $5000 in the pocket.

At that point, Anderson testified he had more than a hunch that Kemar was involved in criminal activity. He asked Kemar if he would accompany him and the sergeant to their office just beyond the terminal building. Kemar agreed,

31

maintaining a calm demeanor.  Anderson testified that if Kemar had not agreed, he would have seized the bag, although he did not tell Kemar that.

With Kemar carrying his bag, and free of any restraints, they drove in a police sedan 200 yards to the office.  Once there, an officer opened the bag's sealed walls and discovered over $140,000.  Although Kemar said he packed his own bag, he denied owning the money or knowing it was there.  He signed a form disclaiming ownership, and Anderson let him leave with his luggage, but not the cash inside.

In denying the suppression motion, the court credited Anderson's factual recitation, and found that Kemar voluntarily consented to answer Anderson's questions, to permit the officer to search his bag, and to accompany Anderson to his office.  Applying California law, citing State v. Mollica, 114 N.J. 329, 347 (1989), the court held that Anderson did not detain or seize Kemar when he approached him, asked him questions, and obtained permission to search his bag.  Kemar consented voluntarily, and California law did not require Anderson to tell Kemar he could refuse.

Both defendants contend that Anderson's interaction with Kemar constituted a detention – if not when he initially approached, then after he asked

if he possessed a lot of cash – and Anderson lacked a reasonable and articulable suspicion of a crime to justify that intrusion. We disagree.

We first address the applicable law. Although both defendants rely on New Jersey case law, New Jersey law does not govern our analysis. That is because, "[w]ith regard to law-enforcement activities, a state constitution ordinarily governs only the conduct of the state's own agents or others acting under color of state law." Id. at 345. "[I]t does not offend [New Jersey's] constitutional principles . . . to allow the transfer of criminal evidence from the officers of another jurisdiction . . . when the evidence has been obtained lawfully by the former without any assistance by the latter." Id. at 352 (allowing evidence seized by federal officials in compliance with the Fourth Amendment, but not the New Jersey Constitution). There was no proof at the hearing that Anderson was working with New Jersey law enforcement when he seized the cash.

Rather, we look to federal jurisprudence, since the Supremacy Clause requires us to exclude evidence obtained in another state in violation of the Fourth Amendment. See State v. Evers, 175 N.J. 355, 378 (2003). We would not be obliged to enforce California law with the exclusionary rule even if it were more stringent than federal law, Evers, 175 N.J. at 376-77 (declining to exclude evidence obtained in violation of California statute), especially since

California's constitution bars its own courts from suppressing evidence seized contrary to California but not federal law. See Cal. Const., Art. I, § 28(d); In re Lance W., 694 P.2d 744, 752 (Cal. 1985) (stating California constitutional amendment eliminated exclusionary remedy "except to the extent . . . federally compelled"). Enforcing California law would not further the purposes of the exclusionary rule under New Jersey's constitution. See Mollica, 114 N.J. 352-53.

Turning to the merits, the dispositive issue is whether, under federal constitutional law, the law enforcement officers illegally detained Kemar when he permitted the officers to search his luggage. We shall not disturb the court's fact-finding that Kemar voluntarily consented to the search. Voluntariness of consent is determined based on "the totality of all the circumstances." Schneckloth, 412 U.S. at 227. Under federal law, the State is not required to prove that the officer advised the suspect, or the suspect already knew, that he or she was entitled to refuse, although knowledge is a factor in determining voluntariness. Id. at 229-30, 248-49.[7] But, if Kemar consented while illegally

_____

[7] We appreciate that "New Jersey's Constitution . . . provides greater protections than the federal constitution when it comes to consent searches." State v. Shaw, 237 N.J. 588, 619 (2019). For example, New Jersey requires proof of knowledge to establish voluntary consent. See State v. Johnson, 68 N.J. 349, 353-54 (1975).

detained, then the detention would taint the consent, and the fruits of the search would have to be suppressed.  See Florida v. Royer, 460 U.S. 491, 507-08 (1983) (plurality opinion) (holding that "consent was tainted by the illegality [of a detention] and was ineffective to justify the search"); Id. at 509 (Powell, J., concurring) (agreeing with the plurality that search "cannot be viewed as consensual" when given during illegal arrest).

Officers may detain or seize a person upon a reasonable and articulable suspicion of criminal activity, but the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Id. at 498-500. However, as the State concedes, before the officers found what appeared to be a hidden compartment in Kemar's luggage, Anderson operated only on a hunch about Kemar.  The question, then, is whether Anderson was permitted, absent reasonable suspicion, to approach and question Kemar as he did.  Put another way, we must decide whether Anderson unlawfully seized or detained Kemar at any point before Kemar consented to the luggage search.  Applying federal law, we conclude Anderson did not.

---

But, we shall not exclude evidence on that ground, because Kemar did not enjoy those protections.

"[M]ere police questioning" in a public place "does not constitute a seizure" requiring reasonable suspicion under the Fourth Amendment. <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual" and the officer need not have reasonable suspicion regarding the person's activities to continue the interaction. <u>Id.</u> at 434 (quoting <u>California v. Hodari D.</u>, 499 U.S. 621, 628 (1991)); <u>see also</u> <u>Mendenhall</u>, 446 U.S. at 554 (opinion by Stewart, J.,) (stating that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave").[8]

---

[8] We recognize, as have other courts, that most people will not feel free to deny an officer's requests under circumstances that the Supreme Court has declined to characterize as a detention. <u>See, e.g.</u>, <u>United States v. Thame</u>, 846 F.2d 200, 202 (3d Cir. 1988). However, it has been suggested that we not take the Supreme Court test too literally. <u>See</u> 4 Wayne R. LaFave, <u>Search & Seizure</u> § 9.4(a) (5th ed. 2012) (stating that "what is needed is an interpretation of the <u>Mendenhall-Royer</u> test grounded in the proposition that police, without having later to justify their conduct by articulating a certain degree of suspicion, should be allowed 'to seek cooperation, even where this may involve inconvenience or embarrassment for the citizen, and even though many citizens will defer to this authority of the police because they believe – in some vague way – that they should'" (citation omitted)).

"[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage – as long as the police do not convey a message that compliance with their requests is required." Bostick, 501 U.S. at 434-35 (internal citations omitted); see also Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984) (per curiam) (stating "[t]he initial contact between the officers and respondent, where they simply asked if he would step aside and talk with them" implicated "no Fourth Amendment interest").

Viewing the totality of circumstances, several factors support the conclusion that Kemar was free to leave or to terminate the interaction with the officers. Anderson did not display a weapon, accuse Kemar of a crime, use a commanding tone of voice, or intimidate Kemar with the presence of several officers (at least before he consented to the search). He told Kemar he was not under arrest and not in trouble.

In Mendenhall, the agents – as did Anderson – approached a traveler in a public concourse, wearing plain clothes, and not displaying weapons; they identified themselves as law enforcement officers and then asked, not demanded, to see the traveler's identification and ticket. 446 U.S. at 547-48.

Justice Stewart concluded that "no seizure occurred." Id. at 555. As in Kemar's case, absent were circumstances that "might indicate a seizure," such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. at 554. Nor did the interaction become a detention after the agents inquired about discrepancies in the traveler's documents, she agreed to the agents' request that she accompany them to the office to answer further questions, and she there consented to a search of her person and luggage. Id. at 548, 557-59. She was not told she had to go; and her ticket and identification had been returned. Id. at 557-58.

By contrast, the Supreme Court found that narcotics agents seized an air traveler when they approached him at the airport concourse, told him they were narcotics agents, accused him of transporting drugs, asked for and then retained his ticket and driver's license, retrieved and held the person's luggage, and then asked him to go to a room forty feet away without indicating he was free to depart. Royer, 460 U.S. at 494-95, 501.

Applying Mendenhall and Royer, the Third Circuit concluded that a police-citizen interaction at Philadelphia's 30th Street Station, which has

striking parallels to the case before us, did not constitute an investigative stop. Thame, 846 F.2d at 201. A city police officer, followed by a drug enforcement agent and an Amtrak investigator, approached the defendant as he reached the train station lobby from the train platform. Id. After the officer identified himself, Thame agreed to speak to him, to give his name, and to show his train ticket, which bore a different person's name. Id. Thame explained it was a friend's ticket, and showed other identification that had his correct name. Id. The officer showed the identification to the drug enforcement agent, then returned it to Thame. Id. at 202. The officer then asked Thame if he could search his bag and Thame refused, because it contained "sensitive material." Id. at 202. But, Thame consented to a dog sniff, which the officer proposed as an alternative. Id. The officer then asked Thame if he would mind accompanying them to the Amtrak office, which would be more private and out of the way. Id. Thame carried his own bag to the office, where a dog twice alerted to drugs. Id. A warrant was then obtained for the search. Id.

The court rejected Thame's argument that he was seized the moment he refused to consent to the search. Id. at 204. "Unlike the defendants in Mendenhall, Royer, and Rodriguez, Thame did not consent to a search after he moved to another area in response to the officers' request, but rather was only

A-3811-15T2

asked to move to the Amtrak police office <u>after</u> he consented to the sniff test."
<u>Id.</u> at 203. Likewise, in this case, Kemar had already agreed to a search of his luggage when Anderson suggested that they go to the office 200 yards away. Thus, even if Kemar were unlawfully detained in the office, the consent to search was not tainted because Kemar gave it during the consensual encounter in the baggage claim area.

In any event, we are satisfied that Anderson had a reasonable and articulable suspicion to detain Kemar by the time he asked Kemar to accompany him to the office. In <u>Royer</u>, the Court agreed that police had sufficient suspicion to justify an investigative detention based on: the defendant traveled under a false name; he paid cash for a one-way ticket; he checked his bag under a different name; and aspects of his appearance and conduct were consistent with those of a drug courier. 460 U.S. at 502. The Court noted that "had Royer voluntarily consented to the search of his luggage while he was justifiably being detained on reasonable suspicion, the products of the search would be admissible against him." <u>Ibid.</u>

The circumstances involving Kemar provide comparable support for detaining him in the office, to complete the search to which he had already consented. The sergeant discovered fresh glue and a bulge, indicating

something was secreted in the luggage wall; Kemar misstated how much cash he was carrying, but ultimately admitted he possessed $5000 on his person; Kemar traveled on a one-way ticket, recently purchased, from a drug source city; he said he was there to visit friends and family, but he provided no details about where or how long he would stay; and he repeatedly looked over his shoulder and made multiple phone calls as he entered the baggage claim area. Applying his significant experience and training, Anderson stated that these factors created more than just a hunch that Kemar was a drug courier. We agree.

Therefore, the trial court did not err in denying defendants' motion to suppress the fruits of the search of Kemar's luggage. As the trial court found, he voluntarily consented to the search; and, we conclude, no unlawful detention tainted that consent.

## IV.

Davis argues his double-jeopardy rights bar retrial on the leader-of-a-narcotics-trafficking network charge, on which the jury was hung. He invokes the "same conduct" or "same evidence" test for determining whether a subsequent prosecution is for the "same offense" as the one for which a defendant has been convicted. See U.S. Const. amend. V (stating that no person "shall be subject for the same offence to be twice put in jeopardy of life or

41

limb"); N.J. Const. art. I, ¶ 11 (stating "[n]o person shall, after acquittal, be tried for the same offense").[9] We review his argument de novo. Miles, 229 N.J. at 90.

The "same evidence test" is an "an alter ego" of the "same conduct test," id. at 101 (2017) (Albin, J., dissenting), and it bars subsequent prosecution "if it relie[s] on the same evidence used to prove an earlier charge," id. at 93. See also State v. DeLuca, 108 N.J. 98, 107 (1987) (stating that "[i]f the same evidence used in the first prosecution is the sole evidence in the second, the prosecution of the second offense is barred") (emphasis added); State v. Colon, 374 N.J. Super. 199, 217 (App. Div. 2005) (quoting DeLuca). The "same evidence" test applies to crimes committed on or before the date of the Court's opinion in Miles, when it abandoned that test. 229 N.J. at 86. Instead, the Court held, consistent with the United States Supreme Court jurisprudence, that going forward the "same elements" test, first enunciated in Blockburger v. United

---

[9] Although our State Constitution refers only to trial after acquittal, our courts have interpreted it to be "coextensive with the guarantee of the federal Constitution." State v. Miles, 229 N.J. 83, 92 (2017). Yet, our Supreme Court has in the past interpreted its double-jeopardy guarantee as more protective of the federal guarantee. Id. at 101-03 (Albin, J., dissenting).

States, 284 U.S. 299 (1932), would be "the sole test for determining what constitutes the 'same offense' for purposes of double jeopardy." Ibid.[10]

We recognize that in successfully proving the conspiracy count, and the distribution-or-possession-with-intent-to-distribute count, the State relied on evidence that Davis directed others, including Bernard and Kemar – evidence it would presumably utilize in retrying the leader count. However, we need not delve into whether the State would, in the subsequent prosecution, rely solely on the evidence it presented in the first. That is because a retrial after a hung jury would not offend the double jeopardy clause.

"[T]he failure of the jury to reach a verdict is not an event which terminates jeopardy." Richardson v. United States, 468 U.S. 317, 325 (1984); State v. Cruz, 171 N.J. 419, 425-26 (2002) (reaching the same conclusion under the New Jersey Constitution); State v. Travers, 229 N.J. Super. 144, 149 (App. Div. 1988) (stating that "a prerequisite to the operation of" the double jeopardy bar "is the termination of the former prosecution upon which the claim of double jeopardy is predicated"). Although "[i]n some sense a defendant is in jeopardy

---

[10] Davis does not argue that he satisfies the "same elements" test. Under that test, "if each statute at issue requires proof of an element that the other does not, they do not constitute the same offense and a second prosecution may proceed." Miles, 229 N.J. at 93.

when required to be retried following a mistrial because of a deadlocked jury[,] . . . the jeopardy to which the defendant is exposed is considered a continuation of original jeopardy, which was not terminated by the mistrial." State v. Abbati, 99 N.J. 418, 426 (1985).

In support of this hung jury rule, the Supreme Court has cited the public's interest in the sound administration of justice. "[A] failure of the jury to agree on a verdict [is] an instance of 'manifest necessity' which permit[s] a trial judge to terminate the first trial and retry the defendant, because 'the ends of public justice would otherwise be defeated.'" Richardson, 468 U.S. at 323-24 (quoting United States v. Perez, 22 U.S. 579, 580 (1824)). Barring a retrial after a hung jury "'would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed.'" Id. at 324 (quoting Wade v. Hunter, 336 U.S. 684, 688-89 (1949)).

If a jury acquits a defendant of a charge, and in so doing, determines that the government has failed to establish facts that are essential elements of the hung count, then principles of collateral estoppel and double jeopardy would bar retrial of the hung count. Yeager v. United States, 557 U.S. 110, 119 (2009) (stating that "'when an issue of ultimate fact has once been determined by a valid

and final judgment' of acquittal, it 'cannot again be litigated' in a second trial for a separate offense" (quoting Ashe v. Swenson, 397 U.S. 436, 443 (1970))); see also State v. Snellbaker, 272 N.J. Super. 129, 136 (App. Div. 1994) (stating that where jury hangs on greater charge, the New Jersey Constitution "might well bar prosecution 'after acquittal' at least of an elemental lesser-included offense, even if both charges had been originally moved simultaneously in the same proceeding").  However, Davis was not completely acquitted of any charge.[11]

Even if the conspiracy count for which Davis was convicted were considered a lesser-included offense of the leader charge about which the jury was hung – a point the State disputes – double-jeopardy principles do not bar retrial of the leader charge.  As we observed in Snellbaker:

> [W]here a jury is deadlocked on indictable offenses simultaneously moved with lesser or lesser-included charges on which [the] defendant is convicted, the reprosecution of the greater offense is not barred because the "retrial . . . is not a successive prosecution" and "[t]he jury's failure to reach a verdict on [one] count is not an event that terminates jeopardy."
>
> [Id. at 135 (quoting Commonwealth v. McCane, 539 A.2d 340, 346 (Pa. 1988)).]

---

[11]  We acknowledge that the jury found that the money laundering involved the second-degree range of at least $75,000, but not the first-degree range of $500,000 or more as charged.

Other courts agree. See also United States v. Bordeaux, 121 F.3d 1187, 1193 (8th Cir. 1997) (stating that "where the jury expressly indicates that it is unable to reach an agreement on the greater charge, a conviction on a lesser included offense does not constitute an implied acquittal of the greater offense and presents no bar to retrial on the greater offense"); People v. Fields, 914 P.2d 832, 838 (Cal. 1996) (holding that double-jeopardy principles did not bar retrial of greater offense on which jury expressly deadlocked, where jury returned conviction on lesser charge; but statute barred retrial); Hunt v. State, 622 A.2d 155, 157 (Md. App. 1993) (stating that under the Fifth Amendment's double-jeopardy clause, "when an individual is indicted on two offenses, one being a lesser-included offense of the other, and the jury is hopelessly deadlocked as to the greater offense but has entered a judgment on the lesser-included offense, the government is not precluded from prosecuting the greater offense").

Had the State waited to indict Davis on the leader charge until after his trial and conviction of the other charges, we would be compelled to apply the relevant tests to ascertain whether the subsequent trial was for the same offense. See Brown v. Ohio, 432 U.S. 161 (1977) (stating that double-jeopardy clause barred sequential prosecution of greater offense of auto theft after defendant pleaded guilty to lesser charge of joyriding); State v. Dively, 92 N.J. 573, 582-

46

83 (1983) (holding that double jeopardy barred trying a driver for death by auto after he pleaded guilty to reckless driving, which was an essential element of the more serious charge). Such sequential prosecutions would raise the kind of oppression that the double-jeopardy clause is designed to prevent. But, the State tried the charges together.

In sum, we reject Davis's argument that double-jeopardy principles bar retrial of the leader charge, about which the jury was unable to reach a unanimous verdict.

## V.

Defendants' remaining points require relatively brief comment.

## A.

We reject Davis's contention that his money laundering conviction must be reversed. Davis argues the State failed to prove that he separately concealed, disguised, or legitimized the proceeds of the drug transactions. However, the statutory provisions upon which the State relied, N.J.S.A. 2C:21-25(a) and 25(b)(1), do not require that showing.

Under subsection (a), a person is guilty of money laundering if he or she "transports or possesses property known or which a reasonable person would believe to be derived from criminal activity." N.J.S.A. 2C:21-25(a). N.J.S.A.

2C:21-25(d) states that a property is "known to be derived from criminal activity if the person knows that the property involved represents proceeds from some form . . . of criminal activity."  N.J.S.A. 2C:21-25(d); see State v. Harris, 373 N.J. Super. 253, 265 (App. Div. 2004) (noting that N.J.S.A. 2C:21-25 "'reach[es] well beyond'" laundering behavior and criminalizes "'any possession of property known to be derived from criminal activity'" (quoting Cannel, New Jersey Criminal Code Annotated, cmt. on N.J.S.A. 2C:21-23 (2004))).

Subsection (b)(1) does require two transactions.  It makes it a crime if a person "engages in a transaction involving property known or which a reasonable person would believe to be derived from criminal activity . . . with the intent to facilitate or promote the criminal activity . . . ."  N.J.S.A. 2C:21-25(b)(1).  But, the element does not require a separate predicate act, nor does it require concealment.  Harris, 373 N.J. Super. at 262-63.  It can be satisfied by plowing the proceeds back into the criminal operation that generated them.  Id. at 266 (affirming conviction under subsection (b)(1) where the defendant received proceeds from fraudulent real estate transactions, and then "assisted her accomplices in using those proceeds to fund further fraudulent transactions").

By contrast N.J.S.A. 2C:21-25(b)(2) includes the element of concealment, by making it a crime if a person

> b. engages in a transaction involving property known or which a reasonable person would believe to be derived from criminal activity
>
> . . . .
>
> (2) knowing that the transaction is designed in whole or in part:
>
> > (a) to conceal or disguise the nature, location, source, ownership or control of the property derived from criminal activity; or
> >
> > (b) to avoid a transaction reporting requirement under the laws of this State or any other state or of the United States . . . .

See Harris, 373 N.J. Super. at 265-66 (rejecting argument that State needed to prove the defendant concealed or "washed" criminal proceeds, as the State did not charge her under N.J.S.A. 2C:21-25(b)(2)). In sum, we shall not disturb Davis's money laundering conviction.

### B.

We also reject Davis's argument that the court should have declared a mistrial when one juror, after sixteen hours of deliberation, sent a note stating, "Your Honor, I don't want to continue to be part of the deliberations. This is

49

causing some high frustration levels on my part with other members of the jury and I don't feel that I can continue to deliberate with a clear head."

The comment pertained to the jury's deliberative process. See State v. Valenzuela, 136 N.J. 458, 471-72 (1994) (holding the trial court erred in removing a juror after she stated that fellow jurors were "ganging up" on her, they had a "different opinion" of the case and they called her a "hindrance" and "very confused"). The comment did not reflect that the juror was unable to continue because of matters personal to her, unrelated to her interaction with the other jurors. See State v. Jenkins, 182 N.J. 112, 124-25 (2004); Valenzuela, 136 N.J. at 472-73. The court appropriately dismissed the jury for the day, to allow a "cooling off." When the jury returned several days later to resume deliberations, the juror expressed no further concerns about the ability to continue. We discern no error.

## C.

Davis's argument that the court erred by denying his motion to suppress phone calls recorded by investigators while he was in Jamaica lacks sufficient merit to warrant extended discussion. R. 2:11-3(e)(2). As the listening post was in New Jersey, it matters not that some of the calls originated from, or connected to, Davis's phone in Jamaica. See State v. Ates, 217 N.J. 253, 270 (2014)

(holding New Jersey law, like federal law, authorizes wiretaps "when the listening post – and thus the interception – is within the court's jurisdiction, even if the phone is located elsewhere"); see also United States v. Cano-Flores, 796 F.3d 83, 86 (D.C. Cir. 2015) (holding that, since listening post was in Texas, district court had jurisdiction to authorize wiretapping calls involving devices in Mexico).

D.

We turn to Bernard's remaining arguments. We discern no abuse of discretion in the court's denial of her motion to disclose the identities of two confidential informants. See State v. Milligan, 71 N.J. 373, 384 (1976) (establishing abuse-of-discretion standard of review). Bernard had the burden to overcome the informant's privilege. N.J.R.E. 516. She did not demonstrate that the State disclosed the confidential informants' identity, N.J.R.E. 516(a), or that disclosure was essential to a fair trial, N.J.R.E. 516(b). Bernard has not established that the informants were essential witnesses to a basic issue in the case, or were active participants in the crime for which she was prosecuted. See Milligan, 71 N.J. at 383-84. It is not enough to allege without support that the informants might have exculpated her. Id. at 392 (rejecting as speculative claim that informant would impeach State police witness).

A-3811-15T2

Bernard also contends she was entitled to a mistrial because the State did not disclose, before trial, that Hoffman was familiar with Bernard's voice because he conversed with her about her children and other matters unrelated to the charged offenses, after he arrested her. Citing <u>Rule</u> 3:13-3(b)(1)(B), she contends these statements were "admissions or declarations against penal interest made by the defendant that are known to the prosecution but not recorded," and the State was obliged to disclose a summary of them before trial. She argues that had she known in advance that Hoffman would rely on this conversation to identify her voice on the recordings, she would have sought a "voice lineup"; she would have moved to suppress the statements because they were made without <u>Miranda</u>[12] warnings; and she would have approached plea negotiations differently.

First, it is unclear that the fact that Bernard chatted with Hoffman about her children was an admission or declaration against penal interest, notwithstanding that it helped enable Hoffman to identify her voice. On its face, the discovery rule pertains to the substance of statements a defendant made, not

---

[12] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

a law enforcement officer's observations about the tone of the defendant's voice, or other physical characteristics.

Second, we are unpersuaded that, even if the State violated its discovery obligation, the court would have been compelled to order a mistrial under the circumstances. A court exercises broad discretion in determining what remedy, if any, it should impose for a failure to provide discovery, State v. Heisler, 422 N.J. Super. 399, 415 (App. Div. 2011), and, in particular, whether a mistrial is warranted, State v. Harris, 181 N.J. 391, 518 (2004). "[A] mistrial should be granted 'only in those situations which would otherwise result in manifest injustice.'" Harris, 181 N.J. at 518 (quoting State v. DiRienzo, 53 N.J. 360, 383 (1969)).

Bernard does not persuade us that she would have pursued a different trial strategy had the discovery been provided. Id. at 519 (stating "[d]enials of mistrial motions have been overturned where 'a different trial strategy would have been employed' but for the discovery violation" (quoting State v. Blake, 234 N.J. Super. 166, 175 (App. Div. 1989))). Bernard does not deny that she was already aware, before trial, that Hoffman arrested her, and that she spoke, even briefly to him. Furthermore, in identifying Bernard on the recordings, Hoffman also relied on other circumstantial evidence, including people calling

Bernard by her name in the conversations. Bernard provides no competent evidence that she would have pleaded guilty, and under what terms, if only this particular discovery were provided pretrial. Nor are we persuaded that a Miranda motion would have succeeded in suppressing the voice identification. See United States v. Mohammed, 693 F.3d 192, 197 (D.C. Cir. 2012) (stating that "voice identification is not the type of incriminating information Miranda protects," and rejecting the defendant's argument that "his statements were used against him because [the officer] was only able to identify [the defendant's] voice on the recordings at trial from having heard it first during the interrogation").

In sum, any failure to disclose did not work a manifest injustice compelling a mistrial.

## VI.

Finally, we shall not disturb the sentences imposed on defendants. After merging the conspiracy count, the court sentenced Davis to seventeen years with eight years of parole ineligibility, and Bernard to fifteen years with six years of parole ineligibility, for first-degree distribution or possession with intent to distribute cocaine. On the money laundering count, the court imposed a term of eight years with four years of parole ineligibility on Davis, and six years with

54

no parole ineligibility period on Bernard. Consistent with the mandate of N.J.S.A. 2C:21-27(c), the money laundering sentences were consecutive to the drug distribution sentence. Thus, Davis must serve twelve years before parole eligibility on a twenty-five-year aggregate term; Bernard must serve six years on a twenty-one-year aggregate term.

With respect to Davis and Bernard, the court gave great weight to three aggravating factors: the risk defendant would reoffend, N.J.S.A. 2C:44-1(a)(3); the substantial likelihood of involvement in organized criminal activity, N.J.S.A. 2C:44-1(a)(5); and the need to deter the defendant and others, N.J.S.A. 2C:44-1(a)(9).

The court found two mitigating factors for both defendants, but weighed them differently. The court found factors seven, no history of prior delinquency or criminal activity or had led a law abiding life for a substantial period of time before committing the present offenses, N.J.S.A. 2C:44-1(b)(7), and factor eleven, imprisonment would entail excessive hardship to the defendant or the defendant's dependents, N.J.S.A. 2C:44-1(b)(11). However, noting that Davis had a prior contact with the criminal justice system, the court gave factor seven only slight weight; but gave it moderate weight in Bernard's case. The court gave factor eleven slight weight as to both defendants. The court concluded

that, for Davis, the aggravating factors substantially outweighed the mitigating factors; for Bernard, the court found that the aggravating factors simply outweighed the mitigating.

Although these are certainly substantial sentences, we discern no basis to disturb the court's exercise of sentencing discretion. The sentencing guidelines were not violated; the court based its findings of aggravating and mitigating factors upon "competent and credible evidence in the record"; and the court's application of the guidelines does not make "the sentence clearly unreasonable so as to shock the judicial conscience." See State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3811-15T2